**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ALABAMA**
**MOBILE DIVISION**

-----------------------------------------------------------

TEDDY BEASLEY,

        Plaintiff,

   v.

AMAZON.COM SERVICES, LLC,

      Defendants.

**Civ. No.**

**COMPLAINT**

**JURY TRIAL DEMANDED**

-----------------------------------------------------------

Plaintiff, TEDDY BEASLEY, by and through his undersigned counsel, EISENBERG & BAUM, LLP, hereby states his Complaint against Defendant, AMAZON.COM SERVICES, LLC:

### INTRODUCTION

1. This case addresses the discrimination of Plaintiff Teddy Beasley, a Deaf individual who has been subjected to said discrimination at the hands of the Defendant solely by reason of his disability. Despite providing years of dedicated contributions and services to his employer, Defendant Amazon.com Services, LLC ("Defendant" or "Amazon"), Mr. Beasley has endured persistent discrimination in the workplace that impedes his capabilities as an employee. Ultimately, Defendant's repeated failures to accommodate Mr. Beasley have harmed his ability to effectively communicate and be fully integrated with his coworkers, diminishing his performance and sense of inclusion, as well as risking his safety. As a result, Defendant's discriminatory actions constitute a violation of Mr. Beasley's rights under federal law. This action seeks redress for the Defendant's failure to address, much less rectify, the deeply troubling civil rights violations against Mr. Beasley, despite his repeated appeals for intervention with management.

2. Mr. Beasley brings this action to compel Defendant to cease unlawful discriminatory

practices and implement policies and procedures that will ensure effective communication, full and equal enjoyment of the benefits and privileges of employment, and a meaningful opportunity to participate fully in his job and all it has to offer. Plaintiff seeks declaratory, injunctive, and equitable relief; compensatory and punitive damages; and attorneys' fees and costs to redress Defendant's unlawful discrimination on the basis of disability in violation of Title I of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*., and Section 504 of the Rehabilitation Act of 1973, ("Rehab Act") 29 U.S.C. § 794.

## PARTIES

3.     Plaintiff Teddy Beasley is deaf and substantially limited in the major life activities of hearing and speaking. Thus, he has a disability within the meaning of state and federal civil rights laws. He is a resident of Montgomery, Alabama.

4.     Upon information and belief, Defendant Amazon.com Services, LLC is a foreign limited liability corporation conducting business as Amazon.com and has owned, operated, managed, maintained, and/or controlled the facility at 7635 Trippel Road, Theodore, AL 36582.

5.     Defendant has a registered address for service at c/o Corporation Service Company Inc., 641 South Lawrence Street, Montgomery, AL 36104.

6.     Upon information and belief, Amazon.com Services, LLC is a recipient of federal financial assistance.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction for the federal law claim under 28 U.S.C. §§ 1331 and 1343 because this action arises under the laws of the United States. This Court also has supplemental jurisdiction for the state law claims under 28 U.S.C. § 1367 because those claims are substantially related to the federal law claims.

8.      Venue is proper in this District under 28 U.S.C. § 1391(b) because, among other factors, Defendants reside in this District, and the acts and omissions giving rise to this Complaint occurred in this District.

## STATEMENT OF FACTS

9.      Mr. Beasley is a profoundly deaf individual who communicates primarily in American Sign Language (ASL).

10.     Some background on deaf culture is necessary to understand the balance of this case. English and ASL are different languages, and therefore Mr. Beasley is unable to effectively communicate by reading lips. Lip reading is the ability to understand the speech of another by watching the speaker's lips. It is no substitute for direct communication through a qualified sign language interpreter because many mouth movements appear identical on the lips. What is more, even if a primary ASL user were able to determine the sounds appearing on a speaker's lips, he or she would still not necessarily understand the English language because English and ASL are distinct languages with different grammatical structures. As another example, ASL and French Sign Language are also distinct languages.

11.     Due to the inherent limitations of lipreading, Mr. Beasley cannot make out most of the aural information that is presented during important communications. It is not possible for people who lipread to consistently understand everything that is said by lipreading alone. Common difficulties associated with lipreading include but are not limited to: normal speech is too fast to lipread easily, many sounds are not seen on the lips, many speech patterns look similar on the lips, and many sounds look alike, even though they are different.

12.     Many factors outside of Mr. Beasley's control reduce the effectiveness of lipreading. Many people may not speak clearly, have facial hair or accents that interfere with lipreading, cover

parts of their mouth when speaking, and/or not look directly at the person who is lipreading.

13.     Mr. Beasley requires ASL interpretation either remotely by video interpretation or in-person to receive equal participation and equally effective communication in the workplace, including important administrative meetings, training, and other important work-related communications.

14.     In his role at Amazon, Mr. Beasley's essential functions include collaborating with colleagues, operating machinery, adhering to safety guidelines, following company policy, communicating with administrative staff, using computer systems, attending staff meetings and training, and reviewing important documents.

15.     Mr. Beasley requires ASL interpretation to fulfill these essential functions depending on the specific task.

16.     Mr. Beasley completed an online application to work for Defendant in the summer of 2020. He was subsequently invited for an interview.

17.     The defendant provided an interpreter for Mr. Beasley's first in-person interview.

18.     However, when Mr. Beasley arrived for his second in-person interview, he realized Defendant failed to secure an interpreter.

19.     As a result, his second interview had to be rescheduled for several weeks later.

20.     Mr. Beasley finally completed the second interview in September and began working for the Defendant on October 11, 2020.

21.     Upon being hired, Mr. Beasley again informed Defendant of his status as a Deaf individual and requested ASL interpretation so he could communicate effectively in his duties at work.

22.     Mr. Beasley made a written accommodation request with the Defendant's Human

Resources Department ("HR") outlining this need for ASL accommodations.

23.     At the beginning of Mr. Beasley's employment, Defendant agreed to his request for ASL accommodations and provided them with little difficulty.

24.     However, following changing guidelines associated with the developing COVID-19 pandemic, the Defendant began reducing the accommodations available to Mr. Beasley. With more work taking place in person, the COVID-19 restrictions on who could enter the building hindered Mr. Beasley's request for an in-person interpreter.

25.     When Defendant consistently failed to provide in-person interpretation for several consecutive weeks, Mr. Beasley was finally provided with Video Remote Interpreter Services (VRI).

26.     In-person ASL interpretation is Mr. Beasley's most effective accommodation, but he reluctantly agreed to VRI due to the Defendant's failure to consistently provide in-person interpreters.

27.     A VRI service can provide some communication assistance for deaf and hard-of-hearing individuals when utilized by properly trained individuals with a reliable internet connection. However, VRI services are often insufficient in a workplace setting because it may be hard for the VRI device to capture an entire room where multiple individuals may be communicating with ASL, and a Deaf individual must also rely upon their co-workers to effectively use the VRI device to communicate back to them.

28.     Mr. Beasley notes that on several occasions, his co-workers failed to use VRI to communicate with him.

29.     In one incident of many, Mr. Beasley entered a large staff meeting and realized there were no accommodations present.

30.     Only after Mr. Beasley expressed that he did not know what was going on due to a lack of communication access were Defendant's employees reminded of their responsibility to set up the VRI for Mr. Beasley.

31.     However, the meeting had already begun before the VRI was set up for Mr. Beasley, rendering him without full knowledge of the meeting's contents as the meeting went on, and he was not privy to the information previously discussed, making him feel like an afterthought.

32.     Because many of his colleagues worked remotely, Mr. Beasley had significant difficulty contacting his coworkers and supervisors, exacerbated by his lack of ASL interpretation.

33.     Though Mr. Beasley repeatedly tried to address his concerns with HR regarding the lack of access to meetings, they failed to take any meaningful action.

34.     Mr. Beasley filed at least three complaints concerning his lack of accommodations, but management still did not take action.

35.     As a result, Mr. Beasley was denied equal access to several important meetings related to his job functions and safety on the job, including meetings regarding evacuation and emergency procedures.

36.     Since the introduction of VRI in the workplace, both Defendant and its employees have failed to adequately use the system to foster effective communication with Mr. Beasley.

37.     In his nearly four years of working for Defendant, for example, Mr. Beasley notes rarely having experienced meetings where VRI is used or is fully functional.

38.     Mr. Beasley feels unsafe in his workplace because interpretation services are not implemented during safety trainings and emergency drills.

39.     As a result, Mr. Beasley and the other deaf workers at Amazon must rely on their hearing coworkers to inform them of a fire or hurricane drill using gestures. This poses an extreme

safety risk to both Mr. Beasleys and his colleagues.

40.     In addition to Mr. Beasley, several other Deaf employees have also experienced similar issues and lodged complaints.

41.     Upon information and belief, Defendant does not have a written policy and/or procedure outlining the evacuation process or proper emergency response for deaf individuals in the workplace.

42.     Mr. Beasley also expresses that he is "the last person [in the workplace] to know anything" since he is regularly excluded from conversations and meetings because Defendant fails to provide him with appropriate communication access.

43.     Concerningly, HR repeatedly tries to communicate with Mr. Beasley without accommodations, despite the fact that Mr. Beasley wears a vest at work that explicitly says, "I'm Deaf."

44.     Despite Mr. Beasley's frequent requests, the Defendant and the Defendant's employees also generally avoid using VRI for meetings, training, and coaching, rendering Mr. Beasley unable to participate equally, if at all, in many of his work-related obligations.

45.     A female operations manager was responsible for setting up the laptop with VRI for staff meetings but failed to do so on almost all occasions.

46.     As a result, Mr. Beasley's access to communication was diminished. The female operations manager often communicated with Mr. Beasley via pen and paper instead of using legitimate ASL accommodations.

47.     Mr. Beasley's lack of accommodations dramatically hinders his performance and inclusion in the workplace.

48.     During one such incident, Mr. Beasley and his coworkers were called to attend a safety

meeting.

49.     At this meeting, the "safety hostess"—the woman leading the safety session—began to play her informational videos without subtitles or an interpreter for Mr. Beasley, rendering him unable to understand the safety measures.

50.     Mr. Beasley asked the safety hostess to stop the video and implement accomodations so he could understand it.

51.     When she failed to do so, Mr. Beasley went to Human Resources to report the situation.

52.     When Mr. Beasley returned to the meeting, Human Resources workers came with him to fix the situation.

53.     After Human Resources left, Mr. Beasley saw the safety hostess wink at one of Mr. Beasley's coworkers behind him.

54.     In a similar incident, Mr. Beasley tried to approach a colleague named Brian, to alert him to a broken pallet jack Mr. Beasley had found.

55.     However, Brian quickly dismissed Mr. Beasley, telling him the pallet jack "was not our problem," even though Mr. Beasley found it in his assigned work area at the roster computer.

56.     Mr. Beasley returned to the roster computer feeling uncertain about his interaction with Brian, especially due to the communication gap, as there was no interpreter present.

57.     Hoping to clarify the situation, Mr. Beasley approached a worker from Human Resources.

58.     The Human Resources worker informed Mr. Beasley that Brian wrote him up for not working in his assigned area.

59.     However, Brian falsely told the Human Resources worker that Mr. Beasley was assigned to an area called "Non-con."

60.     Mr. Beasley explained to the Human Resources worker that he had, in fact, been assigned to the roster computer in area A.

61.     In response, the Human Resources worker acknowledged that Brian lied about the situation to implicate Mr. Beasley.

62.     Brian deliberately targeted Mr. Beasley on account of his disability, knowing it would make him a more susceptible target to his lies since Mr. Beasley could not effectively communicate due to a lack of accommodation.

63.     In another incident, Mr. Beasley approached his second Operation Manager to report that the number of pallets at his station was incorrect.

64.     However, the Operation Manager turned and walked away from Mr. Beasley before answering.

65.     Mr. Beasley witnessed the Operation Manager approach another individual, high-five him, and then have a minutes-long conversation with this individual while Mr. Beasley was still waiting.

66.     The Operation Manager then returned to Mr. Beasley and told him, without explanation, that Mr. Beasley needed to "work better."

67.     Mr. Beasley did not understand what the Operation Manager meant, especially since he did not know the full extent of the situation due to a lack of communication access.

68.     When Mr. Beasley questioned the Operation Manager's claim, the Operation Manager became angry.

69.     At no point did the Operations Manager attempt to use VRI to communicate with Mr. Beasley.

70.     The operation manager threatened to write up Mr. Beasley, but still did not explain the

situation or the nature of the discipline.

71.     When Mr. Beasley continued questioning the Operation Manager's unfounded conduct, the Operation Manager wrote Mr. Beasley up and handed the document to Brian.

72.     Brian approached Mr. Beasley in front of several smirking co-workers and told him to sign the document.

73.     However, the document lodged many untruthful complaints against Mr. Beasley, including a false accusation that he was "stealing time."

74.     Though he attempted to explain that these accusations were false, Mr. Beasley had trouble effectively communicating with Brian without proper accommodations.

75.     Ultimately, since there was no interpreter present, Mr. Beasley, Brian, and a female Operations Manager resorted to communication via paper and pen, writing notes back and forth to converse.

76.     However, note-writing is ineffective in facilitating effective communication for Mr. Beasley. ASL is a language unique from English, much like Spanish and French are unique languages. Writing a note in English to someone whose primary language is French does not surmount the communication barrier; the note is still written in a language unfamiliar to the other party. The same is true of ASL. Merely writing the message in English does not change the fact that the message is communicated in the reader's non-native and non-primary language. Further, someone communicating by writing a note will necessarily include less detail and context than they would when speaking due to the inherently limited nature of a short, written note. As a result, note-writing — even when paired with lipreading — cannot facilitate effective communication in a workplace setting for Mr. Beasley, whose primary language is ASL.

77.     As a result, Mr. Beasley was denied a full understanding of the contents of the

document and, without proper ASL accommodations, could not understand why Brian still wanted his signature.

78.     When Brian continued to pressure Mr. Beasley for a signature, Mr. Beasley suggested they go to HR.

79.     When they arrived at HR, Brian spoke to the employees and Mr. Beasley was left out of the conversation as he still did not have proper accommodations.

80.     Mr. Beasley refused to sign the document because he could not fully understand the situation, especially since the list of grievances against him was not true.

81.     Days later, Mr. Beasley finally received an explanation of the situation from HR. They acknowledged that the write-up was incorrect and unfounded.

82.     Brian confronted and pressured Mr. Beasley, and the Operations Manager targeted Mr. Beasley because they knew or should have known that his deafness, combined with a lack of accommodations, would make him an easier target for their coercion.

83.     To this day, Mr. Beasley does not fully understand either of the incidents that occurred with Brian and his Operation Manager because he had no communication access at the time.

84.     Mr. Beasley repeatedly tried to explain that the contents of this complaint were untrue but felt unheard since he did not have access to an interpreter, and none of his managers seemed convinced of his sincerity.

85.     Unable to bridge this communication gap, Mr. Beasley felt pressured to change his responses to align with management for fear of losing his job.

86.     Mr. Beasley repeatedly communicated his concerns about the company's inadequate VRI practices to his bosses throughout his employment.

87.     However, Mr. Beasley notes that despite alerting his supervisors, no action was taken

to improve his lack of accommodation at work.

88.    The actions of Defendant's employees compromised Mr. Beasley's ability to participate equally when he could not communicate in his preferred and primary language via VRI.

89.    Defendant knew or should have known of its obligations under the state and federal anti-discrimination laws to develop policies to promote compliance with these statutes and to provide reasonable accommodations, including the provision of ASL interpretation to ensure equal communication, participation, and treatment of deaf individuals.

90.    Defendant knew or should have known that its actions and inactions created an unreasonable risk of causing Mr. Beasley greater levels of emotional distress than a hearing person would be expected to experience.

91.    Plaintiff has always been qualified to perform all functions of his job with reasonable accommodation.

92.    Despite Plaintiff's best efforts, Defendant and its employees have treated Plaintiff in a way that is deliberately indifferent because of his disability and have repeatedly failed to accommodate Plaintiff's disability.

93.    Because Defendant failed to accommodate Mr. Beasley, he endured workplace conditions that were objectively substandard and inferior to those granted to hearing employees.

94.    In doing so, Defendant acted with deliberate indifference to Mr. Beasley's civil rights, denying him the opportunity to fully participate in or contribute to its services and programs.

95.    Further, the Defendant has repeatedly failed to make reasonable modifications in policies, practices, or procedures, denying Mr. Beasley the ability to communicate effectively in his role as an employee.

96.    Because of Defendant's discrimination, Mr. Beasley suffered from embarrassment,

violation of his civil rights, emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, and damage to his reputation and career prospects.

97.     Defendant's refusal to treat Mr. Beasley in the same manner as hearing individuals left Plaintiff feeling rejected, confused, and like an afterthought.

98.     Accordingly, Mr. Beasley filed charge number 425-2023-01006 with the Equal Employment Opportunity Commission (EEOC) and received notice of his right to sue on May 16, 2024.

## CAUSES OF ACTION

### CLAIM I:     Violations of Title I of the Americans with Disabilities Act

99.     Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

100.    At all times relevant to this action, Title I of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., has been in full force and effect and has applied to Defendant's conduct.

101.    At all times relevant to this action, Mr. Beasley has been substantially limited in the major life activities of hearing and speaking. Therefore, Mr. Beasley has a disability within the meaning of the ADA. 42 U.S.C. § 12102(2).

102.    Mr. Beasley is an employee within the meaning of Title I of the ADA. 42 U.S.C. § 12111(4).

103.    Defendant is an employer within the meaning of Title I of the ADA. 42 U.S.C. § 12111(5).

104.    Title I of the ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

105.    Title I of the ADA defines discrimination to include "limiting, segregating, or classifying a . . . employee in a way that adversely affects the opportunities or status of such . . . employee because of the disability of such . . . employee." 42 U.S.C. § 12112(b)(1).

106.    Title I of the ADA defines discrimination to include "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4).

107.    Title I of the ADA defines discrimination to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

108.    Defendant discriminated against Mr. Beasley on the basis of his disability in violation of Title I of the ADA and its implementing regulations.

109.    Defendant further discriminated against Plaintiff by failing to ensure effective communication through frequent and proper use of its Video Remote Interpreter (VRI) services.

110.    Defendant has failed to implement policies, procedures, and training of staff necessary to ensure compliance with Title I of the ADA and its implementing regulations.

111.    Defendant's discrimination against Plaintiff caused him to suffer from discrimination, unequal treatment, and exclusion.

112.    Mr. Beasley is entitled to damages and an award of attorney's fees, costs, and disbursements under the ADA. 42 U.S.C. § 12188(a)(1)-(2); 42 U.S.C. § 2000a-3.

**CLAIM II:       Violations of Section 504 of the Rehabilitation Act**

113.    Plaintiff repeats and re-alleges all preceding paragraphs in support of this claim.

114.    At all times relevant to this action, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, was in full force and effect and applied to the Defendant's conduct.

115.    At all times relevant to this action, Plaintiff has had substantial impairment to the major life activity of hearing within the meaning of the Rehabilitation Act regulations at 45 C.F.R. § 84.3(j). Accordingly, he is an individual with a disability as defined under 29 U.S.C. § 708(20)(B), Section 504, as amended.

116.    At all times relevant to this action, Defendant, upon information and belief, has received federal funds, and has therefore been a program or activity receiving federal financial assistance pursuant to 29 U.S.C. § 794(b).

117.    Pursuant to Section 504, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .." 29 U.S.C. § 794.

118.    Defendant subjected Plaintiff to discrimination, solely on the basis of his disability, in violation of 29 U.S.C. § 794.

119.    Plaintiff is therefore entitled to compensatory damages, injunctive relief, and an award of attorney's fees, costs, and disbursements, pursuant to 29 U.S.C. § 794(a).

120.    The Rehabilitation Act explicitly authorizes the remedies available under 42 U.S.C. § 1981a. Specifically, 29 U.S.C. § 794a(a)(2) provides that "[t]she remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any

recipient of Federal assistance or Federal provider of such assistance under section 794 of this title."

121.     Accordingly, 29 U.S.C. § 794a(a)(2) provides that anyone bringing claims of discrimination against a recipient of federal funding may avail themselves of the remedies in 42 U.S.C. § 2000e-5(e)(3), which in turn states: "*In addition* to any relief authorized by section 1981a of this title . . . an aggrieved person may obtain [other] relief . . . ." 42 U.S.C. § 2000e-5(e)(3)(B) (emphasis added). And 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

122.     As such, "*any person aggrieved* by *any act or failure to act* by any recipient of Federal Assistance . . . under section 794" is entitled to the "remedies, procedures, and rights" not only in "title VI of the Civil Rights Act of 1964," but also in "subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5)." 29 U.S.C. § 794a(a)(2) (emphasis added).

123.     The statutory text of 42 U.S.C. § 2000e-5(e)(3), in turn, authorizes certain relief "[i]n addition to any relief authorized by section 1981a," and 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

124.     The remedies of 42 U.S.C. § 1981a are well suited to prevent discrimination in contracts and Plaintiffs are beneficiaries of the contract between the Federal Government and Defendant.

125.     Plaintiffs also have the right to other forms of compensatory damages beyond emotional-distress damages because Defendants are subject to remedies traditionally available in suits for breach of contract. "Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in

16

had the contract been performed." Rest. (Second) of Contracts § 347 cmt. A (Am. L. Inst. 1981). Here, when employees like Mr. Beasley interact with employers like Defendant, they expect that they can communicate effectively and enjoy the same workplace conditions as their hearing coworkers.

126.    Accordingly, Plaintiff had an expectation interest in the ability to fully participate in his workplace and enjoy the same work conditions as his hearing peers. Defendant denied Mr. Beasley this expectation interest by denying him the ability to effectively communicate or fully participate in his workplace. Mr. Beasley is entitled to compensatory damages under this expectation interest.

127.    Accordingly, Plaintiff seeks nominal, compensatory damages, and all remedies available under contract law as set forth above, and attorneys' fees, costs, and disbursements for the injuries and loss he sustained as a result of Defendant's discriminatory conduct and deliberate indifference as alleged under 29 U.S.C. §794a.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A.  Issue an injunction forbidding Defendant from implementing or enforcing any policy, procedure, or practice that denies deaf individuals meaningful access to, and full and equal enjoyment of, Defendant's facilities, services, or programs in violation of Title I of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act;

B.  Issue an injunction ordering Defendant to:

    i.  create, issue, and follow a policy prohibiting future discrimination against Plaintiff or other deaf or hard-of-hearing individuals by failing to provide effective communication;

ii. create, issue, and follow a policy requiring that when deaf or hard-of-hearing individuals request an on-site interpreter or fully effective VRI for effective communication, one will be provided as soon as possible in all services provided by Defendant;

iii. train all employees, staff, and other agents regularly about the rights of individuals who are deaf or hard of hearing under state and federal law;

iv. develop, implement, promulgate, and comply with a policy requiring a clear offer of language assistance services.

C. Order Defendant to take such affirmative steps as may be necessary to restore, as nearly as practicable, Plaintiff to the position she would have been in but for the discriminatory conduct.

D. Award to Plaintiff:

i. Nominal damages;

ii. Compensatory damages;

iii. Punitive damages;

iv. Reasonable costs and attorney's fees;

v. Interest on all amounts at the highest rates and earliest dates allowed by law; and

vi. Any and all other relief that this Court deems just and appropriate.

## **JURY DEMAND**

Plaintiff demands trial by jury for all of the issues a jury properly may decide, and for all of the requested relief that a jury may award.

Dated: August 13, 2024                          Respectfully submitted,

Andrew Rozynski, Esq.
Lucy Trieshmann, Esq.
**EISENBERG & BAUM, LLP**
24 Union Square East,
PH New York, NY 10003
Tel: (212) 353-8700
Fax: (917) 591-2875
arozynski@eandblaw.com
ltrieshmann@eandblaw.com

Edward I. Zwilling, Esq.
SDAL Bar No.: ZWILE1564
**Law Office of Edward I. Zwilling, LLC**
4000 Eagle Point Corporate Drive
Birmingham, AL 35242
(205) 822-2701
edwardzwilling@zwillinglaw.com

*Attorneys for Plaintiffs*